

# NUMBER 13-23-00189-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JOSE YTUARTE,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

## ON APPEAL FROM THE 399TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Silva**
**Memorandum Opinion by Justice Silva**

Jose Ytuarte appeals his aggravated assault with a deadly weapon conviction, a

second-degree felony.[1] *See* TEX. PENAL CODE ANN. §§ 12.33, 22.02(a)(2). Following a

---

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN.

jury trial, Ytuarte was convicted and sentenced to nine years' imprisonment. Ytuarte argues (1) the trial court abused its discretion in overruling his objection to the admission of undisclosed witness testimony; and (2) the trial court erred in instructing the jury on the transferred intent doctrine and including the definitions for "deadly weapon" and "serious bodily injury" in the jury charge. We affirm.

## I. BACKGROUND

Two months prior to indictment, Ytuarte's counsel requested that the State provide the "names, current addresses, current telephone numbers of any witnesses which may be called by the prosecution in this cause pursuant to Rules 702, 703, and 705 of the Texas Rules of Evidence." Ytuarte was indicted on June 5, 2019, he pleaded not guilty, and the case proceeded to trial.

At a pretrial hearing on February 14, 2023, Ytuarte argued he had yet to be given a lay or expert witness list from the State, and the State denied having received notice of Ytuarte's request. The trial court confirmed that a request had been filed, sua sponte reset the case for a trial two weeks out, and instructed the State to "file [its] notices." No written order followed.

On February 28, 2023, the parties conducted voir dire and empaneled a jury. After the State called its first witness, Ytuarte approached the bench and notified the trial court that the witness called was not on the list provided by the State. The State argued that it had only been ordered to provide Ytuarte with a list of its expert witnesses, and the

---

§§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). Because this is a transfer case, we apply the precedent of the San Antonio Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

witness in question, a custodian of records, was not an expert witness. Therefore, the State surmised, it had not erred in failing to disclose the witness prior to trial. The following colloquy ensued:

[YTUARTE]: Judge, as far as not being given a witness list, are you just going to allow them to call anybody they want even though I never got a witness list pursuant to your order from two weeks ago? And again, the expert list is not timely. It's been 14 days—13 days I believe since I have gotten it. That's not timely and I don't—I think their experts should be excluded. Texas case law is clear on that.

THE COURT: When did you file it, the day of the last hearing?

[YTUARTE]: It was—

[STATE]: Yeah, the same day.

[YTUARTE]: And I got served with it the next day, I believe.

THE COURT: And then I set it for this time and you didn't make any objections to ask for additional time from this week at all or a few more days or a week?

[YTUARTE]: No, I was asking for it to be excluded two weeks ago. I'm asking it to be excluded today because it's not timely. It is in violation of the law and the Michael Morton statute and that they had four years to give it to me and they didn't give it. You're letting them off the hook. That's what ends up happening, when I request something four years ago, they give it to me, you know, the day of trial and it's just—that's prejudicial to the defendant. That's why the remedy I believe is exclusion, because they have given you no reason. They told you there was no reason why they didn't give me a list for four years.

. . . .

THE COURT: We all knew when I reset it[,] they were going to file it that day and it was going to be set this time and no one

3

|  | asked for additional [sic] another week or anything like that. |
|---|---|
| [YTUARTE]: | Correct. I asked for exclusion. I mean, because it's not timely. Again, it just—the law, the "shall" part isn't until like, well, okay, when they don't do it[,] we just give them time and time and time again until they get it right. The time—it's "shall." When I request it, it shall be given to me before the trial setting at least 20 days and they haven't done it. And that's why, again, it's just—it just lets the prosecution off the hook. And, you know, it happens repeatedly, and the reason they have never given us stuff on time—well, not never, but oftentimes they don't give us stuff on time is because they think, well, the Judge will just let me out of the statutory requirement. That's the part that is not right. That's why I'm saying the evidence should be excluded. |
| THE COURT: | Response? |
| [STATE]: | Judge, I just—I think we're arguing a moot point here since I'm not even planning on introducing any expert testimony. That's what I keep going back to, but we're— |
| THE COURT: | That's fine. I'll deny it. I got his objections. They're noted for the record. |

The trial court ordered the State to provide Ytuarte with the names of any outstanding witnesses and trial proceeded.

Nine witnesses testified at trial, but we include only testimony relevant to the disposition of the appeal.

San Antonio Police Department (SAPD) patrol officer Alejandro Palacios testified that on April 1, 2019, he was dispatched to a bar at 9:42 p.m. following reports that a man had been shot. Officer Palacios immediately "identified three key eyewitnesses": James Macias, the complainant; James Wright, Macias's friend; and Jessica Ytuarte, the alleged

4

shooter's wife.[2]

Macias testified that he and Wright had met at the bar for drinks earlier in the evening and were seated in the outside patio area when Macias received a Facetime call from his ex-girlfriend. Macias was still on the call when he heard a woman, later identified as Jessica, enter the patio area screaming at Wright. Macias testified that while he remained principally preoccupied with his own conversation, noticed Wright stand up and attempt to "calm her down." Macias was turned away from Wright and Jessica when he heard an unknown man yell, "Don't say that to her." Macias was shot seconds later. Macias was eventually transported to a nearby hospital where he underwent an eight-and-a-half-hour surgery. During his hospitalization, law enforcement attempted to administer a photographic lineup. However, Macias was unable to identify Ytuarte.

Wright testified that he knew Jessica and her significant other, Ytuarte, from prior encounters at the bar and identified the shooter as Ytuarte. Wright explained that on April 1, 2019, he and Macias were drinking on the porch outside the bar when Jessica approached them. At some unspecified point, Ytuarte appeared and exchanged words with Wright, though Wright declined to characterize the encounter as argumentative. Wright testified that he did not recall hearing any threatening statements from Ytuarte before Ytuarte unexpectedly drew his firearm and shot Macias, who was seated behind where Wright was standing.

SAPD Officers retrieved surveillance footage from the bar, and the recordings were

---

[2] Only Macias and Wright testified at trial. An investigator with the district attorney's office testified that he had unsuccessfully attempted to serve a subpoena on Jessica Ytuarte on the eve of trial at her residence and place of employment.

admitted into evidence at trial without audio. In one recording, Jessica is seen walking into the patio area, markedly gesticulating as she approaches Wright and Macias, both of whom are seated on the patio. Wright stands up and moves towards Jessica. At all times, Macias remains fixated on his phone. After a few minutes, Ytuarte walks onto the patio and stands by the bar entrance before being joined by Jessica. Seemingly unprovoked, Ytuarte lunges forward toward Wright, pulls out a firearm, and shoots Macias. Ytuarte attempts to hide the firearm in his hooded sweatshirt before running out into the parking lot.

Throughout the trial, law enforcement officers were pressed regarding a possible suspect named "Billy." Officer Palacios explained that the name had been mentioned by an individual inside the bar who did not purport to have witnessed the shooting. He maintained that the name never came up again during the investigation. According to SAPD Detective Robert Neaves, a single shell casing was recovered, but the weapon was not.

During the charge conference, Ytuarte objected to the inclusion of the definitions of "serious bodily injury" and "deadly weapon" in the abstract portion of the jury charge. Ytuarte also objected to the addition of transferred intent language, arguing that it permitted the jury to return a conviction for a theory other than what he had been indicted on. The trial court overruled Ytuarte's objections. The jury returned a guilty verdict and assessed punishment at nine years' incarceration. This appeal followed.

## II. NOTICE

By his first issue, Ytuarte argues the trial court abused its discretion in denying his motion to exclude the State's witnesses after the State failed to produce a witness list in violation of Article 39.14 of the Texas Code of Criminal Procedure and the Texas and U.S. Constitutions. *See* TEX. CONST. art. I § 10; U.S. CONST. art. VI and XIV; TEX. CODE CRIM. PROC. ANN. art. 39.14.

Generally, notice of the State's witnesses shall be given upon request. *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993); *see* TEX. CODE CRIM. PROC. ANN. art. 39.14(b). While Article 39.14 of the Texas Code of Criminal Procedure does not mandate disclosure of witnesses generally, it does mandate the disclosure of testifying expert witnesses following a request by defense—even where unaccompanied by a court order.[3] *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (requiring the State to disclose "not later than the 20th day before the date that jury selection in the trial is scheduled to begin" following a party's request for expert witnesses); *see also Sekula v. State*, No. 04-16-00614-CR, 2018 WL 1402066, at *4 (Tex. App.—San Antonio Mar. 21, 2018, no pet.) (mem. op., not designated for publication).

If the trial judge allows a witness to testify who does not appear on the State's witness list, we review that decision for an abuse of discretion. *Hamann v. State*, 428 S.W.3d 221, 227 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *see also Acevedo v.*

---

[3] Although on appeal Ytuarte presents his Article 39.14 argument contemporaneous to a constitutional challenge, Ytuarte did not assert a constitutional objection at trial. We limit our review accordingly. *See* TEX. R. APP. P. 33.1(a); *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) ("[T]he point of error on appeal must comport with the objection made at trial."); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) ("[I]f a party fails to properly object to constitutional errors at trial, these errors can be forfeited.").

*State*, No. 04-10-00025-CR, 2011 WL 1044402, at *5 (Tex. App.—San Antonio Mar. 23, 2011, pet. ref'd) (mem. op., not designated for publication). We "consider whether the prosecutor's actions constitute 'bad faith' and whether the defendant could have reasonably anticipated the witness' testimony." *Martinez*, 867 S.W.2d at 39; *see also Salazar v. State*, No. 13-16-00645-CR, 2017 WL 6545991, at *8 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2017, pet. ref'd) (mem. op., not designated for publication); *Fox v. State*, No. 04-15-00618-CR, 2017 WL 96160, at *2 (Tex. App.—San Antonio Jan. 11, 2017, no pet.) (mem. op., not designated for publication).

A defendant's challenge to a lack of notice of the State's witness list, however, is waived by a defendant's failure to move for a motion for a continuance. *See Barnes v. State*, 876 S.W.2d 316, 328 (Tex. Crim. App. 1994) ("If a witness' name is not furnished a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of surprise is 'made harmless' by defendant's failure to object or move for a continuance."); *see also Rios v. State*, No. 13-19-00235-CR, 2021 WL 2371525, at *8 (Tex. App.—Corpus Christi–Edinburg June 10, 2021, pet. ref'd) (mem. op., not designated for publication) ("Even if Rios had filed a request for the State's witness list, any error from the lack of inclusion of the list would have been 'made harmless' by his failure to object and move for a continuance."); *Cervantes v. State*, No. 13-17-00157-CR, 2018 WL 6055439, at *7 (Tex. App.—Corpus Christi–Edinburg Nov. 20, 2018, no pet.) (mem. op., not designated for publication) (observing "appellant did not move for a continuance," and therefore, "even if there was error in the admission of the testimony, we are precluded from holding that the error was harmful"); *Schneider v. State*, No. 13-

8

12-00575-CR, 2013 WL 2300995, at *2 (Tex. App.—Corpus Christi–Edinburg May 23, 2013, no pet.) (mem. op., not designated for publication) ("If a witness's name is not furnished to a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of lack-of-notice is waived by the defendant's failure to move for a continuance.").

Here, Ytuarte filed a motion for discovery, requesting the names of all lay and expert witnesses the State intended to call. During a pretrial hearing, Ytuarte informed the trial court of the State's failure to provide him with a witness list ahead of trial and requested that all of the State's witnesses be barred from testifying. In acknowledgment of Ytuarte's outstanding written request, the trial court sua sponte reset the case for trial for two weeks and instructed the State to "file [its] notices." No further specifications were provided, and no written order appears in the record. The trial proceeded two weeks later without objection from Ytuarte. Following the introduction of the State's first witness, Ytuarte objected pursuant to Article 39.14 and asserted that the State had only provided its list of expert witnesses in contravention of Article 39.14. Ytuarte did not request a continuance or object on any basis apart from Article 39.14, which only explicitly mandates the disclosure of expert witnesses. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b). To the extent Ytuarte means to challenge the untimeliness of the State's notice of expert witnesses in addition to his lack of notice of all lay witnesses, Ytuarte's failure to move for a motion for continuance waives either claim on appeal. *See Barnes*, 876 S.W.2d at 328; *see also Granger v. State*, No. 13-12-00292-CR, 2013 WL 5170249, at *2 (Tex. App.—Corpus Christi–Edinburg Sept. 12, 2013, no pet.) (mem. op., not designated

9

for publication) ("If a witness's name is not furnished to a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of lack-of-notice is waived by the defendant's failure to move for a continuance."). We overrule Ytuarte's first issue.

### III. CHARGE ERROR

By his second issue, Ytuarte argues the trial court's inclusion of definitions for "serious bodily injury" and "deadly weapon," as well as language concerning the doctrine of transferred intent, erroneously allowed for Ytuarte's conviction "on a different theory than the one that was alleged in the indictment."

### A. Standard of Review and Applicable Law

The purpose of the trial court's jury charge is to instruct the jurors on the "law applicable to the case." *Bell v. State*, 635 S.W.3d 641, 645 (Tex. Crim. App. 2021) (per curiam) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14). In construing a jury charge, we examine the charge as a whole rather than as a series of isolated and unrelated statements. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). A proper jury charge consists of an abstract statement of the law and the application paragraphs. *See id.* 366–67. The abstract paragraphs of a jury charge serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge. *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). Each statutory definition that affects the meaning of an element of the offense must be communicated to the jury. *Villarreal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009). The application paragraph, meanwhile, exists as the "the 'heart and soul' of the jury charge." *Vasquez*,

10

389 S.W.3d at 367. "The application paragraph is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Id.* at 366. In other words, "the relationship between the two is that definitions and instructions in the abstract portion are like words in a dictionary; their true and correct meaning is not shown until they are properly used in a sentence, i.e., in the application paragraph." *Farris v. State*, 506 S.W.3d 102, 108 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd).

In analyzing an alleged jury charge error, our first duty is to determine whether error exists. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, we then analyze that error for harm, and the standard of review depends on whether the error was preserved. *Alcoser*, 663 S.W.3d at 165 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). If there is error and the defendant preserved the alleged error, then we must reverse if we find "some harm." *Id.*; *Almanza*, 686 S.W.2d at 171. When the jury charge error is not preserved, the court will reverse only upon a showing of "egregious harm." *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019); *Almanza*, 686 S.W.2d at 171. "Harm is assessed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Alcoser*, 663 S.W.3d at 165 (cleaned up). Regardless of the degree of harm required to be shown, the "appellant must have suffered actual, rather than theoretical, harm." *Matew*

*v. State*, 655 S.W.3d 291, 301 (Tex. App.—Corpus Christi–Edinburg 2022, pet. ref'd) (quoting *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008)).

**B.    Analysis**

At the charge conference, Ytuarte objected to the inclusion of the following language:

> "Deadly weapon" means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.
>
> . . . .
>
> "Serious bodily injury" means a bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.
>
> . . . .
>
> You are instructed that a person is criminally responsible for causing a result if the only difference between what actually occurred and what the person desired, contemplated, or risked is that a different person was injured, harmed, or otherwise affected.

Ytuarte contended that the inclusion of the aforementioned was erroneous because it created a variance between the indictment and the jury charge. We address each of these arguments in turn.

**1.    Transferred Intent**

The transferred-intent doctrine provides that a person is criminally responsible for causing a result if the only difference between what actually occurred and what was desired, contemplated, or risked is that a different person was injured, harmed, or otherwise affected. *See* TEX. PENAL CODE ANN. § 6.04(b)(2). In other words, under the

transferred-intent doctrine, a defendant may still be culpable where the defendant intends to shoot one person but misses and strikes another because the defendant's intent to harm the intended victim transfers to the actual victim. *See Delacerda v. State*, 425 S.W.3d 367, 397 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("A 'classic example' of the application of the transferred intent doctrine is 'the act of firing a gun at an intended victim while that person is in a group of other persons.'"); *see also Lewis v. State*, No. 04-12-00428-CR, 2014 WL 1494593, at *7 (Tex. App.—San Antonio Apr. 16, 2014, no pet.) (mem. op., not designated for publication) ("Under the principle of transferred intent, Lewis is criminally responsible for Bennett's death even though the evidence shows Lewis intended to shoot Griffin, not Bennett").

"[A] transferred intent theory need not be alleged in the indictment as a prerequisite to the trial court including such an instruction in the charge." *Delacerda*, 425 S.W.3d at 396 n.11; *Garcia v. State*, 791 S.W.2d 279, 281–82 (Tex. App.—Corpus Christi–Edinburg 1990, pet. ref'd). Where there is evidence supporting a charge on transferred intent, a trial court will not err in giving such a charge. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14; *Bell*, 635 S.W.3d at 645; *see also Landrian v. State*, No. 01-05-00697-CR, 2009 WL 1562844, at *15 (Tex. App.—Houston [1st Dist.] May 29, 2009, pet. ref'd) (mem. op., not designated for publication).

The State accurately points to evidence supporting the transferred intent charge. For instance, Macias testified that he had been on a Facetime call, uninvolved in the ongoing altercation between Wright and Jessica, when Ytuarte intervened and shot him. Wright testified the same. The surveillance footage admitted at trial corroborates Macias's

and Ytuarte's testimony, depicting a contentious encounter to which Macias appeared oblivious. Wright was still standing, engaged in conversation with Jessica when Ytuarte lunged forward toward Wright and discharged his firearm. The bullet missed Wright and struck Macias, who was seated behind Wright. Having considered the evidence adduced at trial, we conclude there is evidence supporting a charge on transferred intent, and therefore, the law was applicable to the case.[4]  *See Bell*, 635 S.W.3d at 645.

Significant here, however, the transferred intent language is present only in the abstract portion of the charge and wholly absent from the application portion. The court of criminal appeals has previously held that this is not error because the application portion—even when read together with the general statement that persons are culpable for the unintended consequences of their felonious acts—would not authorize a conviction under an alternative theory of law. *See Lewis v. State*, 815 S.W.2d 560, 562 (Tex. Crim. App. 1991) (concluding there was no error in giving superfluous abstract instruction on transferred intent when the issue of transferred intent was not incorporated into the application paragraph); *Hughes v. State*, 897 S.W.2d 285, 297 (Tex. Crim. App. 1994) ("When an abstract charge is erroneously given on a theory of law, without specific application to the facts of the case, the overruling of an objection to the abstract charge is not error."); *see also Crenshaw v. State*, 378 S.W.3d 460, 467 (Tex. Crim. App. 2012) (concluding that where a complained-of definition only appeared "in the abstract section of the jury charge, and it was not incorporated into the application paragraph" and "the application paragraph tracked the language information," there was no charging error).

---

[4] Ytuarte does not argue the trial court erred in including the theory in only the abstract portion.

14

Thus, the trial court did not err in including transferred intent language in the abstract portion of the charge.

### 2. "Deadly Weapon"

Ytuarte also argues the inclusion of the "deadly weapon" definition was improper. An assault is heightened to aggravated assault if the person "causes serious bodily injury to another . . . *or* uses or exhibits a deadly weapon during the commission of the assault." TEX. PENAL CODE ANN. § 22.02(a) (emphasis added). Because the statute alleges alternative methods to constitute aggravated assault, the trial court is bound to include in the jury charge only the method alleged in the indictment. *Uddin v. State*, 503 S.W.3d 710, 716 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000).

Here, Ytuarte's use of a "deadly weapon" was the relevant aggravating element alleged in the indictment:

> [O]n or about the 1st Day of April, 2019, JOSE YTUARTE, hereinafter referred to as defendant, did use and exhibit a deadly weapon, NAMELY: A FIREARM, and defendant did intentionally, knowingly[,] and recklessly CAUSE BODILY INJURY to JAMES MACIAS, hereinafter referred to as complainant, by SHOOTING THE COMPLAINANT WITH SAID DEADLY WEAPON;

Additionally, the application section of the jury charge mirrored the indictment language:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 1st Day of April, 2019, in Bexar County, Texas, the defendant, Jose Ytuarte, did use or exhibit a deadly weapon, namely: a firearm, and Jose Ytuarte did intentionally[,] knowingly, or recklessly cause bodily injury to James Macias, by shooting James Macias with said deadly weapon;

15

Then you will find the defendant guilty of the offense of aggravated assault with a deadly weapon as charged in the indictment.

The definition in the charge tracked the language of the statute. *See* TEX. PENAL CODE ANN. § 1.07(17) (defining "deadly weapon" as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or . . . anything that in the manner of its use or intended use is capable of causing death or serious bodily injury"). "A jury charge which tracks the language of a particular statute is a proper charge on the statutory issue." *Matew*, 655 S.W.3d at 301 (quoting *Riddle v. State*, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994)); *Uddin*, 503 S.W.3d at 716; *see also Baltazar v. State*, No. 14-21-00417-CR, 2022 WL 6619367, at *6 (Tex. App.—Houston [14th Dist.] Oct. 11, 2022, no pet.) (mem. op., not designated for publication). Therefore, the trial court did not err when it includes the definition of "deadly weapon" in the abstract portion of the charge. *See Villarreal*, 286 S.W.3d at 329.

### 3. "Serious Bodily Injury"

Regarding Ytuarte's challenge to the inclusion of the definition of "serious bodily injury," we assume without deciding that the trial court erred as "serious bodily injury" is an alternative theory of committing aggravated assault. *See* TEX. PENAL CODE ANN. § 22.02(a); *Uddin*, 503 S.W.3d at 716. Ytuarte timely objected to its inclusion so we apply the "some harm" standard of review. *See Alcoser*, 663 S.W.3d at 165.

### a. The Entire Jury Charge

Jurors are authorized only to return a verdict under the conditions given by the application paragraph of the court's charge, and we presume the jury followed the trial court's charge. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *see also*

16

*Cartmill v. State*, No. 02-22-00099-CR, 2023 WL 5115531, at *4 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op., not designated for publication) ("The inclusion of a merely superfluous abstraction, therefore, never produces reversible error in the court's charge because it has no effect on the jury's ability fairly and accurately to implement the commands of the application paragraph or paragraphs.").

As previously stated, the application paragraph charged only aggravated assault by use of a deadly weapon. The application paragraph contained no mention of "serious bodily injury." Thus, serious bodily injury could not serve as an alternative or independent basis for convicting Ytuarte. *See Alcoser*, 663 S.W.3d at 165. This factor weighs against finding harm.

### b.     State of the Evidence and Jury Arguments

The State summed up during its opening statement what it believed would be in dispute at trial, and it was not whether the complainant had sustained serious bodily injury. In fact, there was no mention of "serious bodily injury" in the State's opening statements or closing arguments. Rather, the State acknowledged that the focus would be on proving the shooter's identity given the complainant was unable to identify the shooter: "Now, [Macias] didn't see [Ytuarte] well enough to identify him that night, but [Wright] is able to identify [Ytuarte] as the shooter. He knows [Jessica and Ytuarte]. They are familiar with each other and they all frequent that bar together." During closing arguments, the State argued that it had met its burden to identify Ytuarte as the actor responsible: "So let's talk about identity because that's really the key issue here. If you believe [Wright], if you

17

believe his testimony, it ends there really. [Wright] said a thousand percent this man sitting here was the person who shot [Macias]. Okay?"

Even Ytuarte's closing arguments bore on the State's alleged failure to prove Ytuarte's identity as the shooter:

> What is the evidence that the State proved this case beyond a reasonable doubt? It did come out, similarly to opening, in that basically it's [Wright] getting up there and I guess the one sentence is "I'm a thousand percent sure he's the one who shot my brother,[5] [Macias]." All right? That's basically the only evidence they have presented that indicates the possibility that he had been involved in the shooting. Let's be clear about it, there is no doubt that [Macias] got shot at the bar in April of 2019. The issue is who shot him. And the only evidence they presented is [Wright] with that statement.
>
> . . . .
>
> [Macias] said that the person who shot him—you know, he said that to him, "Did you shoot me?" He didn't say[,] "This defendant did it." He said the person who shot me. But again, like I said, lawyers and semantics. He never said [Ytuarte] shot him.

As with the parties' opening statements and closing arguments, the testimony at trial predominantly concerned the identity of the shooter—not whether the shooter caused serious bodily injury. Notably, Ytuarte's cross-examination throughout trial was fixated on the possibility of a suspect that law enforcement declined to pursue and the unreliability of Macias and Wright as witnesses.

Having reviewed the state of the evidence and jury arguments, this factor weighs against finding harm. *See Alcoser*, 663 S.W.3d at 165.

---

[5] Wright clarified that he and Macias are not related, and when he referred to Macias as his "brother," he meant in the colloquial sense.

18

### c. All Other Relevant Evidence

Ytuarte did not refer to other relevant evidence in the record on this issue nor have we found any. *See id*.

We conclude that Ytuarte's assertion that the inclusion of the definition of "serious bodily injury" in only the abstract portion of the charge caused the State to procure a conviction on an alternative theory is unsupported following a review of the entire charge and record. Accordingly, Ytuarte was not harmed by the charge error, and we overrule Ytuarte's second issue in its entirety.

## IV. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
30th day of August, 2024.

19